NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAFAEL L.O., et al., | |
| Petitioner, | Civil Action No. 20-3481 (JMV) |
| v. | **OPINION** |
| JOHN TSOUKARIS, et al., | |
| Respondent. | |

**VAZQUEZ, District Judge:**

This matter originated with a Verified Petition for Writ of Habeas Corpus and Complaint. D.E. 1. Presently pending before the Court is the motion of Petitioners' Rafael L.O.,[1] Adrian E. G.G., and Javier S.M., ("Petitioners") for a temporary restraining order ("TRO"), immediate release, and/or order to show cause. D.E. No. 5. For the reasons detailed below, the Court will grant the TRO and order Petitioners' release subject to specific conditions. The filing initially included two additional Petitioners, Victor M.L. and Michaell A.G., who have since been released by the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE"). Because those two Petitioners have been released, their motion is dismissed without prejudice.

---

[1] Petitioners are identified herein only by their first name and the first initials of their surnames in order to address certain privacy concerns associated with § 2241 immigration cases. This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

**I.     Background**

Petitioners are immigration detainees being held by ICE at the Essex County Correctional Facility ("ECCF") in Newark, New Jersey. The instant motion was filed in the wake of the ongoing COVID-19 pandemic,[2] that has been reported to have been contracted by both ECCF personnel and inmates.[3]

Each Petitioner submits that he is living with a medical condition that puts him in danger of severe illness or death should he contract COVID-19. Rafael L.O., who is twenty-seven years old, submits that he has asthma and bi-polar disorder. D.E. No. 1 at 23. Adrian E. G.G., who is forty-six years old, submits that he lives with schizophrenia, diabetes, high cholesterol, and high blood pressure. *Id.* at 25. Finally, Javier S.M., who is fifty-one years old, indicates that he has high blood pressure, high cholesterol, signs of early congestive heart failure, untreated obstructive sleep apnea, and pre-diabetes. *Id.* at 29.

Respondents do not contest Petitioners' medical conditions. Instead, Respondents argue that ECCF has taken reasonable precautions and that Petitioners' criminal histories and/or pending criminal charges countenance against release. D.E. 17 at 7-10. Respondents indicate that Rafael L.O. has a 2019 conviction for felony drug offenses and possession of weapon (an air pistol) as

---

[2] Covid-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020. *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited April 7, 2020).

[3] Monsy Alvarado, *Second ICE detainee in New Jersey tests positive for coronavirus*, Northjersey.com, https://www.northjersey.com/story/news/new-jersey/2020/03/26/coronavirus-nj-second-ice-detainee-tests-positive-covid-19/2916525001/ (last visited April 7, 2020).

well as pending felony drug charges from 2018. *Id.* at 7. Javier S.M., Respondents note, has pending state felony charges for criminal sexual contact and endangering/sexual contact. *Id.* at 8. It appears that Javier S.M. was released on his own recognizance by the state criminal court, although Respondents indicate that the state judge may have known that Javier S.M. was to be taken into ICE custody. Adrien E. G.G. has the longest criminal history. Respondents point to numerous convictions between 2013 and 2017 for illegal re-entry into the United States. *Id.* at 9-10. Adrien E. G.G. also has two convictions for drug possession and a 2008 conviction for assault. *Id.*

### A. COVID-19

The COVID-19 pandemic is at the heart of this case. Judge John E. Jones III, in a thoughtful opinion, described the situation as follows:

> In a matter of weeks, the novel coronavirus COVID-19 has rampaged across the globe, altering the landscape of everyday American life in ways previously unimaginable. Large portions of our economy have come to a standstill. Children have been forced to attend school remotely. Workers deemed 'non-essential' to our national infrastructure have been told to stay home. Indeed, we now live our lives by terms we had never heard of a month ago—we are "social distancing" and "flattening the curve" to combat a global pandemic that has, as of the date of this writing, infected 719,700 people worldwide and killed more than 33,673. Each day these statistics move exponentially higher.

*Thakker v. Doll*, Civ. Docket No. 20-cv-480, 2020 WL 1671563, *2, __ F. Supp. 3d __ (M.D. Pa. March 31, 2020) (footnotes omitted). Judge Jones accurately pointed to the swift growth of cases. From the date of his opinion (March 31, 2020) to April 7, 2020, the number of worldwide cases and deaths had risen from 719,700 and 33,673 to 1,282,931 and 72,774.[4]

---

4 *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited April 7, 2020).

New Jersey has been particularly hard hit, with the northern part of the state bearing the initial brunt. As of April 7, 2020, New Jersey had 44,416 cases and 1,232 deaths. *COVID-19 Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited April 7, 2020). The total number of cases and deaths for Bergen County, Essex County, and Hudson County, respectively, were 7,533/263, 5,078/232, and 4,949/95 deaths. *Id.* New Jersey has taken numerous steps, such as the Governor's stay-at-home order on March 21, 2020, to combat the virus. In addition, New Jersey has closed schools indefinitely and closed beaches, state parks, and county parks.[5]

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people." *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html ("*How Coronavirus Spreads*") (last visited April 8, 2020). The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]"[6] COVID-19 is "spread mainly from person-to-person." *How Coronavirus Spreads*. This person-to-person spread can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks. *Id.* The virus can also be spread by infected persons who are not showing symptoms. *Id.*

---

5 *New Jersey closes state parks, state forests and county parks as more than 200 new COVID-19 deaths reported*, 6abc, https://6abc.com/covid19-cases-us-coronavirus-symptoms/6083512/ (last visited April 7, 2020).

6 *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 8, 2020)

Symptoms of COVID-19 can be mild. However, the effects of COVID-19 can be drastically more severe in older individuals or those with certain medical conditions, including persons with asthma, lung disease, heart diseases, diabetes, chronic kidney disease, liver disease or those who are immunocompromised.[7] Besides death, COVID-19 can cause serious, potentially permanent, damage to lung tissue, and can require extensive use of a ventilator. Early evidence suggests that the virus "can damage lung tissue causing a 20 to 30 percent decrease in lung function[.]" D.E. 1 at ¶ 29 (citation omitted). In addition, complications from the virus can manifest rapidly. *Id.* (citation omitted). There is currently no vaccine for COVID-19, nor are there known, clinically-tested therapeutic treatments. *Id.* at ¶ 30. To combat the virus, health officials have emphasized education, social distancing (*i.e.* staying at least 6 feet apart), and improved hygiene. *Id.* (citation omitted).

**B. ECCF**

County jails were not designed with pandemics in mind. To the contrary, they were made to house persons in relatively close contact. In a densely populated area, like Essex County, New Jersey, jails are constructed to handle more persons, whether they be detainees or inmates. The CDC has warned that the risk of exposure may increase in crowded, closed-in settings with little air circulation if the crowd contains persons who are infected. D.E. 1 at ¶ 32 (citation omitted). COVID-19 represents a threat to detainees, inmates, officers, officials, staff, and all others who enter the jail, such as vendors.

Petitioners cite extensively to a March 19, 2020, letter from two qualified physicians to

---

[7] *People Who Are at Higher Risk of Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 8, 2020).

members of Congress. D.E. 1-14. Both physicians had "expertise in medical care in detention settings," and both served as medical subject matter experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties." *Id.* at 1-2. The letter addressed the "imminent risk to the health and safety of immigrant detainees[.]" *Id.* at 3. The physicians stated that "social distancing is essential to slow the spread of the coronavirus to minimize the risk of infection." *Id.* at 4. The doctors stressed that doing so critically reduces the risk of overwhelming treatment facilities.[8] *Id.* As an example, the physicians pointed out that local hospitals have limited ventilators, and as the hospitals treat more COVID-19 patients, they run the real risk of running short of the life-saving equipment – not only for other virus patients but also for patients with other critical illnesses, such as heart attacks. *Id.* The physicians indicated that three areas of actions were needed: (1) procedures for screening, testing, isolation, and quarantine; (2) limiting the transport and transfer of immigration detainees; and (3) using alternatives to detention to enable as much social distancing as possible. *Id.* at 5. To this end, the doctors emphasized that "*it is essential to consider releasing all detainees who do not pose an immediate risk to public safety.*" *Id.* (emphasis in original). At a minimum, the doctors added, ICE should consider releasing all detainees in high risk medical groups. *Id.* at 5-6.

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on April 8, 2020). For example, ICE temporarily suspended all social visitation at detention facilities. *Id.* ICE also released approximately 160

---

[8] Petitioners point out that New Jersey officials have projected a potential shortage of 123,000 hospital beds in the coming weeks. D.E. 1 at ¶ 27 (citation omitted).

individuals who were over the age of 60 or pregnant.  *Id.*  ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per CDC guidance.  *Id.*

As of the filing of Petitioner's case, four employees and one ICE detainee had contracted COVID-19.  D.E. 1 at ¶ 2.  Given the incubation period, Petitioners indicate that it is likely that the ICE detainee contracted the virus while at the ECCF.  *Id.* at ¶ 38.  Prior to the current pandemic, Petitioners noted that DHS's Office of Inspector General ("OIG") "identified serious issues relating safety, security, and environmental health" at ECCF.  *Id.* at 41 (citation omitted).  The OIG concluded that based on the conditions observed, "ICE cannot ensure detainee health at the [ECCF]."  *Id.* at 41.

Petitioners also provide their view of current conditions at the ECCF, relying on a declaration of Rosa Santana, a Program Director at First Friends of New Jersey and New York.  D.E. 1-9.  Santana indicates, based on her personal experience, that in the "dorms" area of ECCF, "approximately 70 detainees sleep, eat, and spend the vast majority of their time . . . in one room together[.] . . . They all share one bathroom with just a few toilets, sinks and showers."  *Id.* at ¶ 7.  In the "pods" area of ECCF, two detainees share a room to sleep, but "approximately 125 detainees share a single common space" where they eat and socialize.  *Id.* at ¶ 8.  Santana adds that these detainees share a bathroom with four showers, but often one or two of the showers are not working.  *Id.*  Santana and her organization hear constant complaints about the "lack of access to medical care and the quality of care that is received," that medical treatment is denied, or that detainees wait an inordinate amount of time in response to medical requests.  *Id.* at ¶¶ 9, 12. Santana is also aware of "unsanitary and unhygienic conditions at the ECCF," such as maggots in the sink or broken boilers.  *Id.* at ¶ 10.  Detainees also report that they lack sufficient soap, hand sanitizer,

and cleaning supplies; if they run out of money, the detainees cannot buy new soap from the commissary.  *Id.* at ¶ 13.  As for a detainee who tested positive for COVID-19, Santana knows that the detainee was in a setting with approximately 40-50 other detainees.  *Id.* at ¶ 17.  Santana has also been receiving recent calls from detainees who are worried that others housed with them are infected as they have sore throats, coughs, and fevers.  *Id.* at 20.

Respondents submitted a declaration from Alfaro Ortiz, the Director of the ECCF.  D.E. 17-1.  On the date of Ortiz's declaration, April 6, 2020, two ICE detainees had tested positive for COVID-19 as had seven inmates in a different building, ten members of the ECCF correctional staff, and one nurse.  *Id.* at ¶ 22.  Ortiz details the efforts of ECCF to deal with the virus.  Ortiz reports that ECCF is currently at seventy-five percent of its capacity and that dorms that were designed to hold sixty detainees now house a maximum of forty-eight.  *Id.* at ¶¶ 4-5.  He states that ECCF has provide informational hand-outs as to COVID-19 and that detainees have space to "sit at least six feet apart."  *Id.* at ¶ 6.  Health care at ECCF is administered by CFG Health Systems, with a physician on-site for sixteen hours a day (and available twenty-four hours) as well as nurse practitioner and two RNs and LPNs at all times.  *Id.* at 9-10.  New detainees are "screened for disabilities upon admission and their temperatures are checked."  *Id.* at ¶ 8.  ECCF is able to re-circulate air within the facility every four hours.  *Id.* at ¶ 13.  Among other measures instituted in response to COVID-19, ECCF educates detainees as to the "importance of hand washing and best practices to prevent the spread of COVID-19" and provides detainees daily access to sick call.  *Id.* at ¶ 15.  ECCF also sanitizes its kitchen hourly, hired additional cleaning staff, and implemented health screening for officers.  *Id.*  New detainees are quarantined for 14 days.  *Id.*  If a detainee exhibits COVID-19 symptoms, he or she is medically evaluated and provided a surgical mask.  *Id.* at ¶ 17.  Detainees with moderate to severe symptoms are

immediately taken to University Hospital, while those with mild symptoms are quarantined. *Id.* at ¶ 18. As of April 6, ECCF had 85 inmates and detainees in quarantine. *Id.* at 19. Detainees who have had a known exposure to COVID-19 but who are asymptomatic are "cohorted," meaning that they are placed with other similar individuals for fourteen days. *Id.* at ¶ 20.

Petitioners assert numerous counts. D.E. 1. As pertinent here, Petitioners assert a violation of substantive due process for failure to reasonable provide safety and protect from harm. *Id.* at 38.

## II. LEGAL STANDARD

The standard for granting a temporary restraining order is the same as that for a preliminary injunction. Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1. Injunctive relief may only be granted when a party demonstrates that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest. *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001).

As to the Court's authority to grant release on a writ of habeas corpus, Petitioner's rely extensively on the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986). *Lucas* concerned a state prisoner's petition pursuant to 28 U.S.C. § 2254 rather than a civil immigration detainee matter. *Id.* at 365-66. The court in *Lucas* determined that the "extraordinary circumstances" standard controlled in determining whether "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition." *Id.* at 367. As an example of such circumstances, the *Lucas* court pointed to *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955),

in which the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill. *Id.* at 366-67. Yet, the court in *Lucas* court continued, it was not suggesting that a petitioner's poor health would be the only situation that would meet the extraordinary circumstances standard. *Id.* at 367.

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Souels*, 688 Fed. App'x 134, 135-36 (3d Cir. 2017).

### III. DISCUSSION

The Court finds that Petitioners have established a reasonable likelihood of success on the merits and similarly met the extraordinary circumstances standard. This determination also addresses Respondents' threshold argument that Petitioners lack standing. D.E. 17 at 24. Respondents argue that "Petitioners do not allege that they have contracted COVID-19, have been exposed to anyone with COVID-19 or that they have suffered any adverse outcomes from the spread of COVID-19." *Id.*

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). Standing to sue is a "[c]omponent of the case-or-controversy" requirement. *Id.* Thus, a court must dismiss a case for lack of subject matter jurisdiction if a plaintiff lacks Article III standing. *Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016). To establish Article III standing, a plaintiff

"must demonstrate '(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.'" *Id.* at 193 (quoting *Neale v. Volvo Cars of N. Am., LLC,* 794 F.3d 353, 358–59 (3d Cir. 2015) (internal quotation marks omitted and punctuation modified)).  The first element, an injury-in-fact, requires that a plaintiff show " 'the invasion of a concrete and particularized legally protected interest' resulting in harm 'that is actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 278 (3d Cir. 2014)).  Moreover, a plaintiff "must clearly and specifically set forth facts sufficient to satisfy . . .standing" as "a federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

The Court finds that Petitioners have standing in light of the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993).  In *Helling*, a prisoner alleged that his Eighth Amendment rights had been violated because he had been exposed to environmental tobacco smoke in prison.  *Id.* at 28.  The Supreme Court ruled as follows:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement *that is sure or very likely to cause serious illness and needless suffering the next week or month or year.*  In *Hutto v. Finney,* 437 U.S. 678, 682, we noted that inmates in punitive isolation were crowded into cells and that some of them *had infectious maladies* such as hepatitis and venereal disease.  This was one of the prison conditions for which the Eighth Amendment required a remedy, *even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed*.  We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery.  *Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.*

> That the Eighth Amendment *protects against future harm* to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is "reasonable safety." *DeShaney*[ *v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 200 (1989)]. It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *Youngberg v. Romeo,* 457 U.S. 307, 315–316 (1982). *It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event.* Two of them were cited with approval in *Rhodes v. Chapman,* 452 U.S. 337, 352, n. 17 (1981). *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974), held that inmates were entitled to relief under the Eighth Amendment when they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures, and *the mingling of inmates with serious contagious diseases with other prison inmates. Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir. 1980), stated that a prisoner need not wait until he is actually assaulted before obtaining relief. . . . We thus reject petitioners' central thesis that only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment.

*Id.* at 33-34 (emphases added). Although decided in the context of an Eighth Amendment claim, the quoted language applies with equal force here. Petitioners do not need to actually show that they have COVID-19 to establish standing.

To succeed on a Fifth Amendment due process claim, Petitioners must show that their conditions of confinement "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees."

12

*E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).  As a result, the Court must ascertain whether the confinement conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose. *Hubbard* 538 F.3d at 232.

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic.  In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. March 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment. *Id.* at *2.  Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental objective in preventing detained aliens from absconding and ensuring their appearance at removal proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective. *Id.*

Judge Jones in *Thakker* reached a different conclusion. *Thakker*, 2020 WL 1671563, *8. Judge Jones noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective. *Id.* Judge Jones reasoned that housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective. *Id.* Judge Jones indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many other options to monitor civil detainees. *Id.*

The Court agrees with the analysis in *Thakker*.  The Court does not find that Respondents have an express intent to punish Petitioners, but also finds that such intent is not a necessary

13

prerequisite. In addition, the Court would – in normal circumstances – agree with the legitimate governmental objective analysis espoused in *Dawson*. But these are not normal times, and context (or factual reality) is important. To use an extreme hypothetical, consider if civil detainees were being housed in a facility that was in the direct path of a hurricane and that the facility was unlikely to withstand the force of the storm. The government would still have a legitimate governmental interest in ensuring that the detainees appeared for immigration court – but the government would not have a legitimate interest in housing the detainees in that particular facility during the hurricane. COVID-19, and its associated risks, is the difference maker – it changes the equation in evaluating the government's legitimate objectives. *See United States v. Martin*, No. 19 Cr. 140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness.").

Petitioners' medical maladies put them in a vulnerable population as to COVID-19. If they do become infected, not only will they be in greater physical jeopardy but they also would put greater pressure on limited medical resources. If the Court credits Rosa Santana's declaration, ECCF is clearly an unsafe environment. But even viewing Director Ortiz's statements, obvious gaps exist. ICE detainees are still housed together, up to forty-eight in a room. While Director Ortiz indicates that ECCF has increased its cleaning capability, notably absent from his declaration are critical areas. Detainees may be advised of the risks of COVID-19, but what are they provided to prevent infection? Director Ortiz does not speak to actual personal hygiene items – such as soap – that are provided to detainees and how often detainees can actually wash. In this regard,

14

Santana's comments about lack of soap and basic hygiene items, along with mass use of limited bathroom and shower facilities, goes unchallenged. While cleaning may be increased, how often are the surfaces, to which the detainees are regularly exposed, properly disinfected?

The Court is not criticizing ECCF or ICE. Both have taken affirmative steps to address the pandemic for which they should be commended. However, there are certain realities that neither ECCF or ICE can overcome. As noted, jails were not designed to fight pandemics, and, unfortunately, such facilities can become perfect vessels for virus transmission. When this case was filed, on April 1, 2020, Petitioners were aware of five cases of COVID-19 in ECCF. Five days later, when Director Ortiz signed his declaration, that number had grown to twenty persons. Petitioners have shown a reasonable likelihood of success on the merits.

Next, the Court assesses whether the irreparable harm necessary for the grant of the injunction exists. "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C. F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (internal citations omitted). When analyzing whether irreparable harm exists, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *See id.*, quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1964).

The Court has already explained the seriousness of the Covid-19 pandemic and its rapid proliferation in this nation. Nonetheless, the Court will provide these sobering nationwide and county-wide confirmed case and death rates as a reminder. As of April 8, 2020, the United States has 425,000 confirmed cases and more than 14,000 deaths.[9] And in what is New Jersey's second-most afflicted county, Essex, there are 5,078 confirmed cases and 232 deaths.[10] Even more concerning, the state's projected peak is likely still weeks away.[11]

As noted earlier in this opinion, in addition to the volume of ECCF detainees confined to inherently limited living and sleeping quarters, they also appear to have limited access to hygiene products and must share bathroom facilities with a large number of persons. Moreover, given the timing of the first confirmed case at ECCF, it appears the detainee contracted the virus while in ECCF's jurisdiction.

The previously described conditions of confinement raise serious concerns about the ability to stop transmission of the virus. With the conditions as currently described, at-risk detainees – including Petitioners -- cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene, that have been touted as the most effective means to thwart the spread of the virus. Against this backdrop, Petitioners have demonstrated irreparable harm should they remain in confinement. *See Thakker*, 2020 WL 1671563 at *7 ("[C]atastrophic results may ensue,

---

[9] *US coronavirus predictions are shifting. Here's why*, CNN, https://www.cnn.com/2020/04/08/politics/what-matters-april-8/index.html (last accessed Apr. 8, 2020, 11:57 p.m.).

[10] *New Jersey coronavirus death toll now at 1,232. Total cases rise to 44, 416 with 3K new positive tests*, NJ.com, https://www.nj.com/coronavirus/2020/04/new-jersey-coronavirus-toll-now-at-1232-total-cases-rise-to-44416-with-3k-new-positive-tests.html (last accessed Apr. 9, 2020, 12:15 a.m.).

[11] *Id.*

both to Petitioners and to the communities surrounding the Facilities."); *see also Hope v. Doll*, Civ. No. 1:20-562 J.E.J. (M.D. Pa. Apr. 7, 2020) ("We cannot allow the Petitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction.")   The Court therefore finds that Petitioners have demonstrated irreparable harm should they remain in ECCF.

The Court is also satisfied that the balance of harms would weigh in favor of Petitioners given their underlying health conditions.  "Before granting an injunction, a district court must balance the relative harm to the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merch Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted).   Here, the potential injury to the Petitioners is grave in light of their health conditions.   This Court has already provided a glimpse of the rate at which the virus has spread thus far, even throughout the segment of the state's population that is at liberty- the living conditions of those detained creates a more untenable situation.    Yet, ICE undoubtedly has a legitimate interest in ensuring that the petitioners do not flee and in protecting the public.  However, the Court believes that it can address those very important interests in fashioning appropriate conditions of release for each Petitioner.

When considering whether the specific action taken by the court serves the public interest, the guiding principle is assessing whether "not that justice be done, but that specific acts presumptively benefitting the public not be halted until the merits could be reached and a determination made as to what justice required."  *Continental Group, Inc., v. Amoco Chemicals Corp.*, 614 F.2d 351, 358 (3d Cir. 1980).  Clearly the public has an interest in preventing the further spread of COVID-19.   Prevention, among other things, preserves critical medical

17

resources necessary to combat the pandemic. Here, the possibility of a widespread outbreak within ECCF would only increase the onus on the state and country's already-overburdened healthcare system. Indeed, as of April 6, 2020, ECCF already had twenty-reported cases. The public has an interest that limited health care resources are available as necessary – which means preventing as many COVID-19 cases as possible – but particularly those necessary for vulnerable persons.

At the same time, the public also has an interest in ensuring that Petitioners do not commit any offenses while on release. Both Rafael L.O. and Adrian E. G.G. have felony convictions, although neither have convictions for offenses of which violence is an element, save Adrian E. G.G.'s conviction twelve years ago. Javier S.M. does not have any felony conviction, but he is facing serious charges in New Jersey. Yet, this Court must acknowledge that the state court released Javier S.M. on his own recognizance. To this end, the Court considers the government's requests completely reasonable, with certain modifications. D.E. 22. Petitioners argue that these limitations are too severe. Yet, the Court notes that the critical argument on which Petitioners rely is that they are unusually vulnerable to COVID-19. In line with that argument, the Court's conditions of release not only protect the public but also protect the Petitioners.

### IV.   Conclusion

For the foregoing reasons, the Court will grants Petitioner's motion for a TRO (D.E. No. 5), and order Petitioners' released subject to the conditions as ordered. An appropriate Order accompanies this Opinion.

Dated: 4/9/2020

JOHN MICHAEL VAZQUEZ
United States District Judge